UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRANDI NICOLE DIONNE,

       Plaintiff,

v.                                                            Case No.  8:21-cv-2962-SCB-SPF

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

     Plaintiff seeks judicial review of the denial of her claim for child's disability benefits and adult disability insurance benefits ("DIB").  The undersigned has reviewed the parties' arguments (Docs. 11, 15) and the administrative record (Doc. 8).  As the Administrative Law Judge's ("ALJ") decision was not based on substantial evidence and did not employ proper legal principles, it is recommended that the Commissioner's decision be reversed.

**I.**

### A.    Procedural Background

     Plaintiff applied for child's benefits, period of disability, and DIB on March 6, 2019 (Tr. 238-51).   The Commissioner denied Plaintiff's claims both initially and upon reconsideration (Tr. 100-01, 133-34).  Plaintiff then requested an administrative hearing.  Per Plaintiff's request, the ALJ held a hearing at which Plaintiff appeared and testified (Tr. 54-72).  Following the hearing, the ALJ issued an unfavorable decision finding Plaintiff not disabled and denied Plaintiff's claim for benefits (Tr. 27-43).  Then Plaintiff

requested review from the Appeals Council, which the Appeals Council denied (Tr. 10-15).  Plaintiff timely filed a complaint with this Court (Doc. 1).  The case is now ripe for review under 42 U.S.C. §§ 405(g), 1383(c)(3).

### B.    Factual Background and the ALJ's Decision

Plaintiff, who was born in 1996, claimed disability beginning August 1, 2018 (Tr. 27-30).[1]  Plaintiff has no past relevant work experience (Tr. 43) and alleges disability due to depression, anxiety, and post-traumatic stress disorder (Tr. 119).  She lives in a house with her boyfriend and her disabled mother, who she cares for (Tr. 57-58).  Plaintiff has a driver's license and a high school diploma, and she completed one year of college (Tr. 59).

In rendering the administrative decision, the ALJ concluded that Plaintiff met the insured status requirements through June 30, 2020 and had not engaged in substantial gainful activity since August 1, 2018, the alleged onset date (Tr. 30).  After conducting a hearing and reviewing the evidence of record, the ALJ determined Plaintiff had these severe impairments: "anxiety/panic disorder, posttraumatic stress disorder, depression, headache, and vertigo." (*Id*.).   Notwithstanding the noted impairments, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 31).  The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform medium work "except she could never climb ladders, ropes,

---

[1]  Plaintiff was born on August 15, 1996.  To be eligible for child disability benefits, Plaintiff must show she became disabled before age 22.  Plaintiff turned 22 two weeks after her alleged onset date of August 1, 2018, but she retained her own insured status through June 30, 2020 (Plaintiff's date last insured, or "DLI").  The period at issue for Plaintiff's DIB claim is August 1, 2018 through her DLI (Tr. 30, n.2-3)

or scaffolds; she could never work around moving mechanical parts or unprotected heights; she could perform simple, routine, and repetitive tasks, but not at a production rate pace; she could make simple work-related decisions; she could occasionally interact with coworkers and the public; and she could tolerate occasional changes in work setting." (Tr. 34).   In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence (Tr. 38).

Considering Plaintiff's noted impairments and the assessment of a vocational expert ("VE"), the ALJ determined Plaintiff could perform work as a linen room attendant, a floor waxer, and an auto detailer (Tr. 43).  Based on Plaintiff's age, education, RFC, and the testimony of the VE, the ALJ found Plaintiff not disabled prior to August 14, 2018 (the date Plaintiff turned 22) or at any time from August 1, 2018 (her alleged onset date) to June 30, 2020 (her DLI) (Tr. 44).  The ALJ denied Plaintiff's applications.

## II.

To be entitled to benefits, a claimant must be disabled, meaning he or she must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which will likely result in death or which has lasted or will likely last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is an impairment that results from

anatomical, physiological, or psychological abnormalities, which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

The Social Security Administration, to regularize the adjudicative process, promulgated the detailed regulations in effect.  These regulations establish a "sequential evaluation process" to determine whether an adult claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920.  If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary.  20 C.F.R. §§ 404.1520(a), 416.920(a).  Under this process, the ALJ must determine, in sequence:  whether the claimant is engaged in substantial gainful activity; whether the claimant has a severe impairment, i.e., one that significantly limits the ability to perform work-related functions; whether the severe impairment meets or equals the medical criteria of 20 C.F.R. Part 404 Subpart P, Appendix 1; and whether the claimant can perform his or her past relevant work.  If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of his or her age, education, and work experience.  20 C.F.R. §§ 404.1520(a), 416.920(a).  A claimant is entitled to benefits only if unable to perform other work.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); 20 C.F.R. §§ 404.1520(g), 416.920(g).

The Commissioner also assesses applications for childhood disability benefits under a sequential analysis.  42 U.S.C. § 1382c(a)(3)(C)(i); 20 C.F.R. § 416.924(a).  The first step is to determine whether the child is working at substantial gainful activity.  20 C.F.R. § 416.924(b).  If not, the second step asks whether the child has a severe impairment.  20 C.F.R. § 416.924(c).  If he or she does not, the child is considered not

disabled.  *Id.*  If there is a severe impairment, the third and final step in the analysis is to determine whether the child's impairment meets, medically equals, or functionally equals, a set of criteria in the Listing of Impairments in Appendix 1 ("the Listings").  20 C.F.R. § 416.924(d).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (internal quotation marks omitted)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citations omitted).

In reviewing the Commissioner's decision, the court may not re-weigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision.  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).  The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal.  *Keeton*, 21 F.3d at 1066. Review is thus limited to determining whether the findings of the Commissioner are supported by substantial

evidence and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

### III.

Plaintiff alleges four errors: the ALJ (1) failed to articulate how she considered the consistency and supportability of psychologist Donald McMurray, Ph.D.'s December 2019 psychological evaluation; (2) erred in finding Plaintiff could perform jobs with a Specific Vocational Preparation ("SVP") level of 2; (3) erred in relying on the VE's testimony regarding the number of jobs available; and (4) lacked the constitutional authority to decide the case (Doc. 11).  The Commissioner responds that substantial evidence supports the ALJ's decision (Doc. 15).  The undersigned discusses each of Plaintiff's arguments and finds that one warrants remand.

### A.    Dr. McMurray

Plaintiff argues that the ALJ erred in finding Dr. McMurray's consultative opinion only "somewhat persuasive." (Tr. 40).  She contends the ALJ's RFC limitation that Plaintiff could tolerate occasional changes in a work setting contradicts Dr. McMurray's conclusion that Plaintiff had marked limitations in responding appropriately to usual work situations and changes in a routine work setting.  The Commissioner counters that, when analyzing Dr. McMurray's evaluation, the ALJ complied with revised regulations addressing how the agency determines the persuasiveness of medical opinions and medical findings.  The Court agrees with the Commissioner.

Before March 27, 2017, Social Security Administration ("SSA") regulations codified the treating physician rule, which required the ALJ to assign controlling weight

to a treating physician's opinion if it was well supported and not inconsistent with other record evidence. *See* 20 C.F.R. § 404.1527(c). Under the treating physician rule, if an ALJ assigned less than controlling weight to a treating physician's opinion, he or she had to provide good cause. *See Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178–79 (11th Cir. 2011).

But in this case revised SSA regulations (published on January 18, 2017, and effective on March 27, 2017) apply because Plaintiff filed her claim in March 2019 and alleged disability beginning August 1, 2018 (*see* Tr. 30). As the SSA explained, "under the old rules, courts reviewing claims tended to focus more on whether the agency sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision ... these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential to us." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017); *see also Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1259 n.4 (11th Cir. 2019).

The new regulations require an ALJ to apply the same factors when considering the opinions from *all* medical sources. 20 C.F.R. § 404.1520c(a). As to each medical source, the ALJ must consider: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(c). But the first two factors are the most important: "Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them primarily on the basis of

7

supportability and consistency." *Mackey v. Saul*, 2020 WL 376995, at *4, n. 2 (D.S.C. Jan. 6, 2020), citing 20 C.F.R. § 404.1520c(a),(c)(1)-(2) (while there are several factors ALJs must consider, "[t]he most important factors ... are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).").

"Supportability" refers to the principle that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). "Consistency" refers to the principle that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). Put differently, the ALJ must analyze whether the medical source's opinion is (1) supported by the source's own records; and (2) consistent with the other evidence of record. *See Cook v. Comm'r of Soc. Sec.*, No. 6:20-cv-1197-RBD-DCI, 2021 WL 1565832, at *3 (M.D. Fla. Apr. 6, 2021), *report and recommendation adopted*, 2021 WL 1565162 (Apr. 21, 2021).

The new regulations also change the standards the ALJ applies when articulating his or her assessment of medical source opinions. An ALJ need not assign specific evidentiary weight to medical opinions based on their source. *See Tucker v. Saul*, No. 4:19-cv-759, 2020 WL 3489427, at *6 (N.D. Ala. June 26, 2020). While the ALJ must explain how he or she considered the supportability and consistency factors, the ALJ need not

explain how he or she considered the other three factors.[2]  20 C.F.R. § 404.1520c(b)(2).
And, in assessing the supportability and consistency of a medical opinion, the regulations
provide that the ALJ need explain only the consideration of these factors on a source-by-
source basis – the regulations do not require the ALJ to explain the consideration of each
opinion from the same source.  *See* 20 C.F.R. § 404.1520c(b)(1).

Here, on December 20, 2019, Dr. McMurray psychologically evaluated Plaintiff
and completed a medical source statement at the agency's request (Tr. 1029-36).  To
prepare, Dr. McMurray reviewed a June 11, 2019 progress note of Plaintiff's appointment
at Bay Care Behavioral Health, a 2015 mental status examination by licensed psychologist
Stephen Perry, Ed.D. (conducted before the relevant period), and Plaintiff's self-reported
anxiety questionnaire and function report (Tr. 1030).  Plaintiff summarized her mental
health treatment history for Dr. McMurray: she had been treated for anxiety, depression,
and panic attacks since she was 16 and diagnosed with major depressive disorder, post-
traumatic stress disorder, anxiety, and panic disorder.  Besides therapy and medication
management, Plaintiff had undergone 25 daily sessions of Transcranial Magnetic
Stimulation ("TMS") treatment (a noninvasive procedure that uses magnetic fields to
stimulate nerve cells in the brain) in early 2019 and Electroconvulsive Therapy ("ECT")
(a procedure where electrodes attached to the scalp deliver electrical pulses to the brain)
three times a week for two months in 2017 (Tr. 1031).

---

[2] The exception is when the record contains differing but equally persuasive medical
opinions or prior administrative medical findings about the same issue.  *See* 20 C.F.R. §
404.1520c(b)(3).

Plaintiff told Dr. McMurray she knows how to take care of herself but struggles to complete activities of daily living and personal hygiene tasks due to depression and anxiety (*Id*.).  She relayed that she dropped out of college after a year and a half due to a "breakdown." (Tr. 1039).  She worked part-time at Sears for about a month but quit because her boss wanted her to sign customers up for a Sears credit card and she "could not handle" interacting with them (Tr. 1031).[3]  Plaintiff is single with no children and at the time of the administrative hearing lived at home with her mom and boyfriend.

Dr. McMurray assessed Plaintiff with panic disorder with agoraphobia, severe major depressive disorder, recurrent without psychotic features, and generalized anxiety disorder (Tr. 1032). He wrote she was "alert and oriented.  She engaged adequately.  She otherwise exhibited no unusual behaviors or mannerisms, and she was cooperative and pleasant throughout the evaluation." (*Id*.).  Her mood was "depressed" and "highly anxious," she had "congruent affect," and her memory was "intact.  Her attention and concentration were appropriate.  Her impulse control is good, as is her judgment." (*Id*.). Dr. McMurray assessed Plaintiff's prognosis as "guarded." (*Id*.).

On his accompanying medical source statement, the psychologist checked boxes indicating that, since Plaintiff was 16, she had experienced marked difficulties in understanding, remembering, and carrying out complex instructions; marked difficulties in her ability to make judgments on complex work-related decisions; and marked difficulties in responding "appropriately to usual work situations and to changes in a

---

[3] Plaintiff did not work at Sears long enough for the agency to consider it past relevant work.

routine work setting." (Tr. 1034).   Under the heading "factors [ ] that support your assessment," however, instead of identifying specific medical findings, Dr. McMurray wrote: "overwhelmed by anxiety – peer motivation due to depression." (Tr. 1034).   He also indicated Plaintiff would have moderate difficulties interacting with the public, supervisors, and co-workers, and Plaintiff's "depression and anxiety are overwhelming. Any pressure or environment change would exacerbate this." (*Id*.).

The ALJ references Dr. McMurray's evaluation (Exhibit 15F in the administrative record) numerous places in her opinion.   The ALJ wrote:

> [M]ental status examination findings demonstrated highly anxious appearance, depressed mood with underlying anxiety, and congruent affect. (Ex. 15F at 3). On the other hand, they also demonstrated good grooming/personal hygiene, adequate eye contact, cooperative/pleasant behavior, intact speech, normal perceptions, goal-directed/relevant information, no evidence of thought disorder, average intelligence, intact memory, appropriate attention/concentration, good impulse control, and good judgment. (Ex. 15F at 3-4).

(Tr. 36).   In her source-by-source analysis, the ALJ compared Dr. McMurray's medical source statement against his own evaluation:

> I have considered the opinion of Donald A. McMurray, Ph.D.  Dr. McMurray concluded that the claimant has no limitation in understanding and remembering simple instructions; mild limitation carrying out simple instructions; mild limitation making judgments on simple work-related decisions; marked limitation understanding, remembering, and carrying out complex instructions; marked limitation making judgments on complex work-related decisions; moderate limitation interacting appropriately with the public, supervisors, and coworkers; and marked limitation responding appropriately to usual work situations and to changes in a routine work setting. (Ex. 15F).
>
> I find these opinions somewhat persuasive.   However, Dr. McMurray overstates the degree of limitation in terms of complex instructions/work-related decisions, interacting with supervisors, usual work situations, and changes in a routine work setting.   Such significant limitations are not supported by his examination of the claimant, which revealed some abnormal

> findings, but also cooperative/pleasant behavior, goal-directed/relevant information, average intelligence, intact memory, appropriate attention/concentration, good impulse control, and good judgment. (Ex. 15F at 3-4).

(Tr. 41).  The ALJ also compared Dr. McMurray's findings to Plaintiff's mental health records from Bay Care, where Plaintiff treated from March 2018 through June 2019 (Dr. McMurray reviewed just one of Plaintiff's Bay Care treatment records in preparing his report).  The ALJ wrote:

> In addition, [Dr. McMurray's] limitations are not consistent with mental status examination findings throughout the relevant treatment records from Baycare Behavioral Health, which revealed some abnormal findings, but also goal-directed thought processes, intact memory, intact attention/concentration, good fund of knowledge, fair to good insight, and fair to appropriate judgment. (Ex. 8F at 2, 5, 7; Ex. 9F at 2, 5, 9, 11, 14, 16, 18; Ex. 12F at 1, 31, 12, 19, 25, 29, 31, 34, 36; Ex. 15F at 3-4).

(*Id.*).

The ALJ explained how she considered the supportability and consistency of Dr. McMurray's opinions, and substantial evidence supports her assessment that they were "somewhat persuasive." (Tr. 41).  Plaintiff treated at Bay Care with psychiatrist Mark Simko, M.D. (medication management), licensed mental health counselor Tara Stewart (psychotherapy), and neurologist Lulu Tsai, M.D. (TMS treatments).  As the ALJ points out, Plaintiff's Bay Care records consistently noted that Plaintiff had logical and coherent thought processes, good insight, appropriate judgment, she was non-delusional, alert and oriented, and her attention and concentration were intact (Tr. 40, 826, 829, 831, 851, 854, 858, 860, 863, 865, 867, 894, 896, 905, 912, 918, 922, 924, 927, 929).

There were abnormal findings, too, which the ALJ accounted for in Plaintiff's RFC.  Plaintiff reported to Dr. Tsai that her depression symptoms worsened in July 2018

(coinciding with her alleged onset date) (Tr. 829).  In September 2018, Dr. Simko wrote that Plaintiff had participated in "multiple trials of antidepressants, mood stabilizers, and atypical antipsychotics[,]" but nothing controlled her symptoms (Tr. 865).  After increasing Plaintiff's dosage of Prozac with no benefit, Dr. Simko noted in October 2018 that Plaintiff had a "long history of depression that has been largely nonresponsive to medication." (Tr. 831).  That same month, Plaintiff switched from a full-time to a part-time schedule due to her depression and anxiety about dealing with customers (Tr. 841).

Dr. Tsai authorized TMS treatments after a neurological evaluation in February 2019 (Tr. 826).  To the neurologist, her symptoms were "moderate," she had fair insight and judgment, and a goal-directed thought process (*Id.*).  Due to a change in Plaintiff's health insurance and the high cost of treatment, Plaintiff did not start the TMS cycle until March 2019.  During week four of the cycle, Plaintiff reported feeling "less foggy" with an improved mood and energy level (Tr. 851).  When she missed several treatment sessions, however, Plaintiff told Dr. Tsai that "[s]he feels easily overwhelmed that she has to come to TMS treatment every day." (Tr. 851).

Plaintiff completed her TMS treatment cycle in April 2019.  Dr. Tsai wrote: "Overall she reports improvement of her mood.  She has better energy level, better motivation, more social interactions with families, more desire to do things.  Her personal hygiene has also improved as well." (Tr. 905).  Plaintiff had only "mild symptoms of depressed mood." (*Id.*).  The next month – May 2019 – Dr. Simko reported that Plaintiff, who had adhered to the same medication regimen since before TMS treatment, "acknowledge[d] improved mood with 'more interest in doing things,' a subjective sense

of more energy and more positive outlook." (Tr. 896).  At what appears to have been her last Bay Care appointment, Plaintiff told Dr. Simko she wanted to see if the "improvement from TMS would last with less medication," so she tapered and then discontinued Wellbutrin, lowered her Prozac dosage, lowered her Seroquel dosage, and was "using the Xanax only as needed and not on a daily basis." (Tr. 894).  Dr. Simko warned her of weaning completely and too quickly and continued her on lower dosages of Prozac, Seroquel, and Xanax (as needed) (*Id*.).

On July 16, 2020 (approximately one month post-DLI and two months since leaving Bay Care), Plaintiff started teletherapy at a mental health clinic called Directions for Living.  She explained she was off her medications because "she lost her insurance at the beginning of the year." (Tr. 1018).  She told Maurice Foster, A.R.N.P. that TMS therapy helped for a "little while, but things got bad again." (*Id*.).  Still, she missed several teletherapy appointments, rescheduled them, and then missed the rescheduled appointments (Tr. 980-84, 990).  Teletherapy records document that Plaintiff was appropriately dressed, maintained good eye contact, had a pleasant and cooperative attitude, her speech was intact, and she exhibited logical and organized thought processes, appropriate mood, intact cognitive functioning, and normal memory (Tr. 973-74, 976, 978, 987, 989, 991, 993-94, 998, 1020, 1022, 1024, 1026).  She described to Mr. Foster a stressful living situation with her aunt and anxiety over "her friends being involved with [police] protests in Kentucky[,]" the presidential election, the overturn of *Roe v. Wade*, and being told by a neighbor to pick up after her dog (Tr. 1022, 1024).  Mr. Foster re-

established her medication regimen of Seroquel, Xanax, Prozac, and Wellbutrin but did not identify functional limitations.

Against this treatment backdrop, the ALJ acknowledged Plaintiff's severe mental illness but found Dr. McMurray's findings only "somewhat persuasive." Citing the substantial evidence summarized above, the ALJ found Plaintiff capable of handling occasional changes in a work setting (Tr. 39). The undersigned reiterates that the Court's job is to determine whether the administrative record contains substantial evidence to support the ALJ's factual findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* Plaintiff's first argument fails.

### B.    SVP Level

Next, Plaintiff challenges the ALJ's finding that Plaintiff can perform jobs with a Specific Vocational Preparation ("SVP") level of 2. The Dictionary of Occupational Titles ("DOT") defines SVP as the time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job situation. DOT (4th ed. rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP. Jobs with an SVP of 2 – such as linen room attendant, floor waxer, or auto detailer, all identified by the ALJ as within Plaintiff's RFC – require anything beyond a short demonstration up to and including one month of vocational training. *Id*.

Plaintiff points out that in May 2019, at the initial level, the agency disability examiner wrote on Plaintiff's Explanation of Determination form: "Although you may

need treatment for your condition, and it may limit your ability to perform your past work, disability cannot be established because you are still capable of performing work that requires less physical effort, and *only a very short, on-the-job training period*." (Tr. 102-03) (emphasis added). A different disability examiner affirmed this finding at the reconsideration level in August 2019 (Tr. 135-36).

But this is not the smoking gun Plaintiff thinks it is. First, Plaintiff's argument relies on the unsupported premise that the disability examiners' findings that Plaintiff can perform a job with a very short, on-the-job training period contradict the ALJ's finding that she is limited to SVP level 2 jobs. Second, to the extent Plaintiff implies the ALJ is duty-bound to follow the agency's findings at the initial and reconsideration levels, she is mistaken. Plaintiff appealed the agency's reconsideration decision, requesting a hearing before the ALJ. The reconsideration determination was not binding on the ALJ. *See* 20 C.F.R. § 404.921(a) ("The reconsidered determination is binding unless – (a) You or any other party to the reconsideration requests a hearing before an [ALJ] within the stated time period and a decision is made[.]"). Additionally, the Explanation of Determination form is not evidence as defined by 20 C.F.R. § 404.1513(a) (listing the categories of evidence), because it is not a statement by an agency medical or psychological consultant and, therefore, is not a prior administrative medical finding. *See* 20 C.F.R. § 404.1513(a)(5) ("A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review[.]").

Third, Plaintiff suggests the disability examiners based their findings on state agency consultative psychologist Pamela Green, Ph.D.'s RFC assessment at the reconsideration level, which the ALJ cherry-picked for evidence supporting Plaintiff's RFC (Doc. 11 at 14-15). Dr. Green opined that Plaintiff had a mild limitation in understanding, remembering, and applying information; a moderate limitation in interacting with others; a mild limitation concentrating persisting, or maintaining pace; and a mild limitation adapting or managing herself (Tr. 110-11, 114-15, 125-26, 129-30). She concluded that Plaintiff could understand simple instructions and complete simple tasks; may experience difficulties relating appropriately to the public, peers, and coworkers; appeared to have the mental capacity to perform daily activities; and would probably perform best in a stable work environment that provided her with clear work-related goals and limited interpersonal demands (*Id.*). Plaintiff contends the ALJ erred because she discussed Dr. Green's conclusions that were less restrictive than Plaintiff's RFC yet ignored the implications of Dr. Green's findings on Plaintiff's maximum vocational training period (Doc. 11 at 14-15).

This argument does not warrant remand. Dr. Green did not limit Plaintiff to jobs that require a very short, on-the-job training period (as had the disability examiners). And even if she had, the ALJ considered Dr. Green's findings and articulated her assessment of them. The ALJ found Dr. Green's findings "somewhat persuasive" but determined Plaintiff is "somewhat more limited in her ability to concentrate, persist, or maintain pace." (Tr. 40). Plaintiff does not challenge this, and her second argument fails.

### C.    VE's Testimony

Plaintiff contends the ALJ relied on faulty VE testimony that an individual with Plaintiff's RFC can work as a linen room attendant (5,900 jobs nationally), floor waxer (118,300 jobs nationally), and auto detailer (39,700 jobs nationally) (Tr. 43).  Plaintiff's argument is two-fold.  First, she contends the VE relied solely on job numbers generated by Job Browser Pro SkillTran ("Job Browser"), a third-party software that compiles numbers from various government sources.  And "[b]ecause the VE did not rely on a reliable governmental source in providing testimony with regards to job numbers, 20 C.F.R. § 404.1566(d), and did not otherwise identify these numbers as being reliable, the VE testimony [ ] did not provide substantial evidence to support the ALJ's decision." (Doc. 11 at 16).

Backtracking, at step five of the sequential evaluation process, the burden shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform."  *Jones v. Apfel*, 190 F.3d 1224, 1229-30 (11th Cir. 1999).  The jobs must exist in significant numbers in the national economy.  20 C.F.R. § 404.1566(a).  The ALJ is required "to articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture."  *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002) (citation omitted).

The Commissioner may take administrative notice of reliable job information available from various governmental and other publications, including the DOT.[4]  20 C.F.R. § 404.1566(d).  In *Goode v. Commissioner of Social Security*, 966 F.3d 1277, 1284 (11th Cir. 2020), the Eleventh Circuit recognized that Job Browser is an acceptable method available to VEs to identify job numbers.  The caveat weaving through caselaw, however, is that the VE cannot rely exclusively on a third-party source for job numbers; the VE must also draw from his or her knowledge and expertise.  *Compare Thompson v. Comm'r of Soc. Sec.*, No. 2:15-cv-53-FtM-CM, 2016 WL 1008444, at *6 (M.D. Fla. Mar. 13, 2016) (VE's testimony unsupported by substantial evidence because it relied exclusively on software program without testimony or evidence that the VE endorsed those numbers based on personal knowledge or expertise), *with Johns v. Comm'r of Soc. Sec.*, No. 6:19-cv-1329-Orl-DCI, 2020 WL 4366081, at *5-6 (M.D. Fla. Jul. 30, 2020) (VE's testimony reliable because it was based on SkillTran data and her own experience and expertise, plaintiff did not challenge VE's qualifications at the hearing or before the court, and plaintiff did not object after learning the VE consulted SkillTran) *and Middleton v. Comm'r of Soc. Sec.*, No. 6:17-cv-85-Orl-40TBS, 2018 WL 1371246, at *7 (M.D. Fla. Feb. 27, 2018) (same) (collecting cases).

Keeping this in mind, the ALJ posed three hypotheticals to the VE.  When the ALJ asked the VE if her testimony followed the DOT, she said (in response to the ALJ's first

---

[4] "The DOT is an extensive compendium of data about the various jobs that exist in the United States economy, and includes information about the nature of each type of job and what skills or abilities they require." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1357 n.2 (11th Cir. 2018).

hypothetical) that it was also based on her "professional experience and performing on-site job analyses, labor market research, and job placement." (Tr. 69). In response to the ALJ's second hypothetical (which corresponded to Plaintiff's RFC), the VE's testimony was based on the DOT and "professional experience" (Tr. 70), and in response to the third hypothetical the VE identified jobs based on "professional experience as previously described." (*Id*.).

Plaintiff's attorney then cross-examined the VE:  "And what's the source of your job numbers for those first few hypotheticals?" (Tr. 71).  The VE responded: "Job Browser Pro, which relies on a variety of different types of Government statistics.  They are full-time and to the DOT level." (*Id*.).  Against the backdrop of the VE testifying at least three times that the job numbers followed the DOT and her own knowledge and expertise, Plaintiff's attorney did not object when the VE offered her opinion, did not move to strike after learning the expert relied on Job Browser, and did not ask to review the VE's computer-generated report (Tr. 67-71).  *See Johns*, 2020 WL 4366081, at *5-6; *Middleton*, 2018 WL 1371246, at *7.  The ALJ wrote: "[The VE] testified that her response was based on her professional experience.  I accept her testimony and the additional information given based on her years of experience and her knowledge of the labor market." (Tr. 43). Plaintiff's contention that the ALJ erred by relying on the VE's testimony because the VE relied solely on Job Browser job information is unsupported on this record.

Changing tack, Plaintiff advances the second prong of her argument (Doc. 11 at 17-18).  Citing *Viverette v. Commissioner of Social Security*, 13 F.4th 1309 (11th Cir. 2021), Plaintiff contends she cannot perform the job of linen room attendant, because it is a

reasoning level three job, and the ALJ limited her to simple, routine, and repetitive tasks (*Id.* at 17).[5]  Once this job is stricken from the list of jobs available to her in the national economy – Plaintiff argues – whether the remaining jobs of floor waxer and auto detailer exist in significant numbers is a question of fact for the ALJ (not the Court) to determine (*Id.*).

The Commissioner admits there is an apparent conflict between the reasoning level three job of linen room attendant and Plaintiff's RFC limitation to simple, routine, and repetitive tasks, impliedly conceding a *Viverette* error (Doc. 15 at 14).  But according to the Commissioner, the number of linen room attendant jobs (5,900) represents only four percent of the 163,900 total jobs the VE identified.  In other words, the *Viverette* error is harmless because there are still 158,000 floor waxer and auto detailer jobs available to Plaintiff, and the Court can endorse this number as significant without remanding the case (*Id.* at 14-15).

The apparent conflict between the VE's testimony and the DOT in *Viverette* eliminated an occupation (document preparer) that represented over 80 percent of the jobs the VE presented to the ALJ.  *Viverette*, 13 F.4th at 1316-18.  The ALJ "apparently treated the three occupations (one of which we must here assume is off the table) cumulatively

---

[5] An ALJ has an affirmative obligation to identify and resolve "apparent conflicts" between the VE testimony and the DOT, otherwise the ALJ's decision is not supported by substantial evidence. *Washington*, 906 F.3d at 1362.  Under *Washington*, "apparent" means that conflict is "reasonably ascertainable or evident" and "seemingly real or true, but not necessarily so." *Id.* at 1366 (citation omitted). In *Viverette*, 13 F.4th at 1317, the Eleventh Circuit held there is an apparent conflict between an RFC limitation to simple, routine, and repetitive tasks and jobs with level three reasoning that the ALJ must address and explain under *Washington*.

for purposes of the 'significant numbers' determination, for she did not make any findings about how many jobs were available in the national economy for each of the occupations." *Id.* at 1318.  Put differently, the ALJ erred in *Viverette* because she did not determine how many of the remaining jobs of final assembler and check weigher (reasoning level one jobs) were available in the national economy *or* whether they separately or cumulatively constituted a significant number.[6]

On the one hand, unlike the *Viverette* ALJ, the ALJ here determined how many floor waxer jobs (118,300) and auto detailer jobs (39,700) existed in the national economy (Tr. 43).  But like the ALJ in *Viverette*, the ALJ did not make a specific finding that the remaining jobs independently existed in significant numbers in the national economy (*Id.*). *Cf. Bresnahan v. Comm'r of Soc. Sec.*, No. 2:20-cv-982-SPC-NPM, 2022 WL 4354841, at * 3 (M.D. Fla. Sept. 20, 2022) ("Plaintiff says *Viverette* controls.  Not so.  Here, the ALJ did not view all six positions that Plaintiff could perform cumulatively.  Just the opposite.  He found that each 'independently' constituted many jobs in the national economy.").  Pre-*Viverette*, the Eleventh Circuit held that 78,000 jobs (and other jobs with similar numbers) amounted to substantial evidence to support the ALJ's step five finding.  *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1010 (11th Cir. 2020); *see also Webster v. Comm'r of Soc. Sec.*, 773 F. App'x 553, 555 (11th Cir. 2019) ("We have upheld an ALJ's finding that 174 small appliance repairman positions in the area in which the claimant resided, 1,600 general

---

[6] The court made the alternate finding that the VE's testimony was unreliable because she identified jobs based on Standard Occupation Classification ("SOC") codes and not the DOT and did not know if the SOC codes required reasoning level one or two or something higher.  *Id.* at 1319.

appliance repair jobs in Georgia, and 80,000 jobs nationwide established the existence of work in significant numbers.").

Post-*Viverette*, however, and constrained by that decision, courts within the Eleventh Circuit (including this one) have remanded cases to the agency when an apparent conflict eliminates jobs the plaintiff can perform – even though the ALJ identified other jobs and their numbers – because the ALJ did not make a specific finding as to whether the remaining jobs are independently of a significant number.  *See Ledford v. Comm'r of Soc. Sec.,* No. 8:20-cv-2516-JSM-SPF, 2022 WL 2195001, at * 4-5 (M.D. Fla. June 1, 2022) (recommending remand under *Viverette* where ALJ did not make independent finding that jobs existed in significant numbers, and at least one job was eliminated due to an apparent conflict), *report and recommendation adopted*, 2022 WL 2193158 (June 17, 2022); *accord Prince v. Kijakazi,* No. 1:21-00110-N, 2022 WL 1156951, at * 10 (S.D. Ala. Apr. 19, 2022); *Grech v. Kijakazi*, No. 8:20-cv-1254-SPF, 2022 WL 485111, at *6 (M.D. Fla. Feb. 17, 2022); *Cisneros v. Comm'r of Soc. Sec.*, No. 2:20-cv-873-JLB-MRM, 2022 WL 354717, at *3 (M.D. Fla. Feb. 7, 2022); *Franklin v. Comm'r of Soc. Sec.*, No. 8:20-cv-1954-JSS, 2022 WL 2294062, at * 5 (M.D. Fla. Feb. 8, 2022); *Roussin v. Comm'r of Soc. Sec.*, No. 2:20-cv-905-SPC-MRM, 2021 WL 6205948, at *16 (M.D. Fla. Dec. 16, 2021), *report and recommendation adopted*, 2022 WL 19698 (Jan. 3, 2022); *Rodriguez v. Kijakazi*, No. 8:20-cv-1232-WFJ-SPF, 2021 WL 6127795, at *4 (M.D. Fla. Nov. 2, 2021), *report and recommendation adopted*, 2021 WL 6126964 (Dec. 27, 2021); *but see Denmark v. Kijakazi*, No. 8:20-cv-2852-AEP, at *8 (M.D. Fla. Mar. 21, 2022) (finding that remand under *Viverette* would be "a useless formality when substantial evidence already supports the ALJ's

conclusion."); *Rodriguez v. Comm'r of Soc. Sec.*, No. 8:21-cv-3002-DNF, 2022 WL 4364506, at * 5 (M.D. Fla. Sept. 21, 2022) (finding harmless error when apparent conflict eliminated approximately 36% of possible jobs).

The *Viverette* panel emphasized that "[w]hether there are a significant number of jobs a claimant is able to perform with his limitations is a question of fact to be determined by a judicial officer [i.e., the ALJ]."  13 F.4th at 1318 (quoting *Martinez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986)).  That is not to say that under no circumstances would a specific number of jobs be considered *per se* significant for step five purposes.  But the undersigned does not opine on what number of jobs would cross the line from insignificant to significant.  *Id.* at 1318-19 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1144 (10th Cir. 2004)) ("[J]udicial line-drawing in this context is inappropriate, [because] the issue of numerical significance entails many fact-specific considerations requiring individualized evaluation, and . . . [because] the evaluation 'should ultimately be left to the ALJ's common sense in weighing the statutory language as applied to a particular claimant's factual situation.'" (citation omitted)).

Although remanding this case for the ALJ to simply state that the jobs of floor waxer and auto detailer independently exist in significant numbers may seem like a formality, "[i]n the words of *Washington*, '[w]e can't disregard the error' – the failure to address the apparent conflict – 'on the grounds that no conflict of fact existed.'"  *Id*. at 1318-19 (quoting *Washington*, 906 F.3d at 1366).  On this record, the undersigned finds that the ALJ erred in relying on the VE's testimony, because it does not constitute substantial evidence.

### D.     Constitutional Authority

Last, Plaintiff asserts a constitutional challenge to the Commissioner's authority based on *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183, 2197 (2020), and argues that the statutory limitations in 42 U.S.C. § 902(a)(3) regarding the removal of the Social Security Commissioner violate the Separation of Powers Clause of the United States Constitution (Doc. 11 at 18-23).  In *Seila Law*, the Supreme Court found that the CFPB, an agency under the auspices of the Executive Branch, was headed by a single individual whom the President could remove only for cause and that this limit on the President's removal powers violated the Constitution's Separation of Powers Clause. 140 S.Ct. at 2191.  Relevant here, the Commissioner of Social Security, under 42 U.S.C. § 902(a)(3), is removable only for cause.  Relying on *Seila Law*, Plaintiff argues the statute is unconstitutional, and the government deprived this claimant of a valid administrative adjudicatory process (Doc. 11 at 19).

The Commissioner agrees that, to the extent 42 U.S.C. § 902(a)(3) is construed as limiting the President's authority to remove the Commissioner without cause, the removal provision is unconstitutional (Doc. 15 at 20, citing Office of Legal Counsel, U.S. Dep't of Justice, *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection*, 2021 WL 2981542 (July 8, 2021)).  But, relying on *Collins v. Yellen*, 141 S.Ct. 1761 (2021), the Commissioner contends that even where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the removal caused him or her harm, a showing Plaintiff cannot make (*Id.* at 23).

Courts within the Eleventh Circuit have repeatedly held that the separation-of-powers argument is meritless in this context. *Herring v. Comm'r of Soc. Sec.*, No. 2:21-cv-322-MRM, 2022 WL 2128801 (M.D. Fla. June 14, 2022); *Vickery v. Comm'r of Soc. Sec.*, No. 5:21-cv-122-PRL, 2022 WL 252 464 (M.D. Fla. Jan. 27, 2022); *Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530 (M.D. Fla. Dec. 21, 2021), *report and recommendation adopted*, 2022 WL 61217 (Jan. 6, 2022); *Perez-Kocher v. Comm'r of Soc. Sec.*, 6:20-cv-2357-GKS-EJK, 2021 WL 6334838, at *3-4 (M.D. Fla. Nov. 23, 2021), *report and recommendation adopted*, 2022 WL 88160 (Jan. 7, 2022). Plaintiff's claim was adjudicated by an ALJ whose tenure was ratified by former Acting Commissioner of Social Security Nancy Berryhill, an officer removable at will and not subject to 42 U.S.C. § 902(a)(3)'s tenure protection (*see* Doc. 15 at 22, n. 5). In *Collins*, the Supreme Court addressed the removal of an Acting Director and found that "if the statute does not restrict the removal of an Acting Director, any harm resulting from actions taken under an Acting Director would not be attributable to a constitutional violation." 141 S.Ct. at 1781. Section 902(a)(3) restricts only the removal of the Commissioner and does not reference an acting Commissioner. It follows that Acting Commissioner Berryhill's appointment was constitutional. *Id*. at 1782.

Acting Commissioner Berryhill was not subject to the unconstitutional removal provision on which Plaintiff bases his claim, and any ratification of an ALJ by Acting Commissioner Berryhill would make that appointment constitutional. "[O]n July 16, 2018 the Acting Commissioner of Social Security [, Nancy Berryhill,] ratified the appointments [of the Social Security Administration's] ALJs and approved those

appointments as her own." 84 Fed. Reg. 9583 (2019).  So, here, the ALJ's appointment, as ratified, is valid.  The ALJ issued her decision in Plaintiff's case on June 1, 2021, well after the ratification date of the ALJ.  Consequently, 42 U.S.C. § 902(a)(3) – the unconstitutional removal provision – did not affect Plaintiff's case.  Plaintiff's final argument fails.

**IV**.

It is RECOMMENDED:

1.  The decision of the Commissioner be REVERSED and REMANDED to the agency for further administrative proceedings.

2.  The Clerk be directed to enter final judgment for the PLAINTIFF and close the case.

IT IS SO REPORTED in Tampa, Florida, on January 13, 2023.

_____
SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.